UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHANNA D. AMIS,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       No.  4:09CV1376 CAS
                                    )                      (FRB)
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.   All
pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

**I.  Procedural History**

On April 18, 2008, plaintiff Johanna D. Amis filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Act, 42 U.S.C. §§ 1381, et seq., in which she
alleged that she became disabled on September 2, 2006.  (Tr. 101-
07, 115-23.)   On initial consideration, the Social Security
Administration denied plaintiff's claims for benefits.  (Tr. 50,
51, 54-59, 62-67.)  On November 14, 2008, upon plaintiff's request,

a hearing was held before an Administrative Law Judge (ALJ). (Tr. 21-49.) Plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. On March 2, 2009, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 7-20.) On July 15, 2009, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on November 14, 2008, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was twenty-seven years of age. Plaintiff completed high school and obtained a GED. (Tr. 25.) Plaintiff is married and has three children, ages one, two and five. (Tr. 26.) Plaintiff testified that her husband does not work because he is disabled. (Tr. 31.)

Plaintiff's Work History Report shows plaintiff to have worked as a cook/cashier at McDonald's from 1996 to 1998. Plaintiff worked in a factory as a machinist from January 2001 to September 2002. From August 2002 to October 2003, plaintiff worked as a technician in a pharmacy. From October 2002 to December 2002, plaintiff worked as a sales clerk. Plaintiff worked as a day care provider from October 2003 to December 2003. Plaintiff last worked

as a weigher in retail from March 2005 to August 2005. (Tr. 138.) Plaintiff testified that she left this last employment because of her inability to concentrate and on account of pain with standing, walking and lifting. (Tr. 26.)

Plaintiff testified that she is unable to work because she has difficulty sitting for periods of time, and has difficulty with standing or walking. (Tr. 29.) Plaintiff testified that she has pain in her neck, down her spine, in her low back, and in her hip radiating down her leg. Plaintiff testified that testing showed her to have fibromyalgia. Plaintiff testified that she had been advised by a doctor that she had leukemia, but that she was later told that the diagnosis was a mistake. (Tr. 30-31.) Plaintiff testified that she had surgery in October 2007 relating to hammertoes and bunions, but that additional repair is needed. Plaintiff testified that she sees her doctor once a month regarding her feet. (Tr. 32-33.)

Plaintiff testified that she began seeing a doctor in 2006 for nervousness and anxiety and that she was diagnosed with post-traumatic stress disorder. Plaintiff testified that she becomes stressed very easily and becomes agitated. (Tr. 36.) Plaintiff testified that she has difficulty sleeping and has restless leg syndrome. Plaintiff testified that she experiences anxiety attacks when she becomes overwhelmed and has too much to do. (Tr. 37.) Plaintiff testified that she has such attacks once

or twice a week and that she begins to feel better within thirty minutes after taking medication. (Tr. 38-39.) Plaintiff testified that her most recent anxiety attack occurred the previous weekend. (Tr. 37-38.)

Plaintiff testified that she has problems with concentration and focus, and will sometimes forget to complete projects she is working on. Plaintiff testified that her children are never put in danger on account of her condition. (Tr. 35.)

Plaintiff testified that she takes various medications for her conditions, including Adderall, Lamictal, Klonopin, and Vicodin. (Tr. 33.) Plaintiff testified that she experiences nervousness with one medication, which aggravates her anxiety condition, but that her doctors "just keep wanting to up the dosage" which, plaintiff testified, "messes with [her] head even more." (Tr. 35.) Plaintiff testified that she sees a psychiatrist once a month. (Tr. 33.)

As to her daily activities, plaintiff testified that she sits on the couch all day and cares for her children with her husband's help. Plaintiff testified that her mother occasionally comes to help with the children. (Tr. 31.) Plaintiff testified that she does some household chores such as vacuuming and some laundry, and that she occasionally cooks. Plaintiff testified that her husband, mother and five-year-old child also help with the chores. (Tr. 31-32.) Plaintiff testified that she drives and will

go to the store to get diapers, but that her husband does the grocery shopping. (Tr. 32.)

As to her exertional abilities, plaintiff testified that she can walk up to ten feet without taking a break. Plaintiff testified that she can stand for six minutes. Plaintiff testified that she cannot sit very long. Plaintiff testified that she can lift her one-year-old child and carry the child on her hip, but that her pain worsens with such activity. (Tr. 29-30.)

B.   Testimony of Vocational Expert

Vincent Stock, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Stock classified all of plaintiff's past work as requiring light to medium levels of exertion. (Tr. 41.)

The ALJ asked Mr. Stock to assume an individual of plaintiff's age, education and past work experience. The ALJ asked Mr. Stock to assume such individual to be

> limited to performing no more than light exertion level what's defined as light exertion level work. The individual's also limited to occasionally climbing ramps and stairs and never climbing ropes, ladders and scaffolds, occasionally balancing, stooping, crouching, kneeling and crawling and the individual should avoid concentrated exposure to hazardous machinery and unprotected heights. This individual is limited to simple tasks only which require no more than occasional contact with the general public and co-workers.

(Tr. 41-42.)

Mr. Stock testified that such a person could perform plaintiff's past work as a pharmacy technician. Mr. Stock testified that although plaintiff's past work as a sales clerk was at the light level, there nevertheless was more than occasional contact with the public. (Tr. 42.) Mr. Stock testified that such a person would also be able to perform work in a housekeeping position. (Tr. 43.)

The ALJ then asked Mr. Stock to consider that the individual was limited to sedentary work, to which Mr. Stock responded that such a person could not perform any of plaintiff's past relevant work but could nevertheless perform other jobs such as security work or computer-related work with sit/stand options. (Tr. 44.)[1]

The ALJ then asked Mr. Stock to assume the individual had an additional limitation in that "any job must allow for occasional unscheduled disruptions of both the work day and work week." (Tr. 44.) Mr. Stock testified that no jobs existed in the national or regional economy that such a person could perform. (Tr. 44.)

Plaintiff's counsel asked Mr. Stock to assume an individual whose limitations were those described in the functional capacity assessment completed by plaintiff's treating physician,

_____

[1]In response to subsequent interrogatories posed to him, Mr. Stock stated that such a person could perform work as a security guard, of which 8000 such jobs existed in the State of Missouri, and 320,000 nationally; and work as a wafer semi-conductor, of which 3000 such jobs existed in the State of Missouri, and 120,000 nationally. (Tr. 355.)

including a GAF score of 50 and an absenteeism rate of more than four days a month. Mr. Stock testified that such limitations would rule out any employment. (Tr. 45-46.)

### III. Medical Records

Plaintiff visited Dr. S. Battula, a psychiatrist, on October 16, 2006, complaining of depression and anxiety. Plaintiff reported that she was easily agitated, could not sit still, had decreased attention and concentration, was distractable and could not focus, had intrusive thoughts and compulsions, and had decreased energy. It was noted that plaintiff's stepfather sexually abused her when she was a child, but that she currently exhibited no major symptoms of post-traumatic stress disorder (PTSD). Plaintiff reported that she had been on anti-depressant medication since age fourteen, was diagnosed with attention deficit hyperactivity disorder (ADHD), had taken Adderall until she was nineteen years of age, and overdosed on medication when she was twenty. Dr. Battula noted plaintiff's previous medications to include Paxil, Prozac, Zoloft, Lexapro, Effexor, and Wellbutrin. Plaintiff's current medications were noted to include Fiorcet for headaches and Robaxin or Trazodone for sleep. Plaintiff reported that she presently worked cleaning houses and that her husband was a painter. Plaintiff's mood and affect were noted to be depressed. Otherwise, mental status examination was unremarkable. Dr. Battula diagnosed plaintiff with attention deficit disorder (ADD) and

depression, not otherwise specified.  Major depressive disorder and obsessive compulsive disorder (OCD) were to be ruled out.  Dr. Battula assigned a Global Assessment of Functioning (GAF) score of 50.[2]  Plaintiff was prescribed Adderall[3] and was instructed to return in four weeks.  (Tr. 275-76.)

Plaintiff visited Dr. Brian Broadhead on November 1, 2006, complaining of a painful bunion deformity and a painful hammertoe deformity affecting the right foot.  Plaintiff reported pain with activity and while at work.  Plaintiff requested surgical intervention inasmuch as past conservative treatment had been ineffective.  Plaintiff's past medical history was noted to be unremarkable.  Physical examination of the lower extremity showed hallux valgus deformity of the right foot and hammertoe deformity of the fourth digit of the right foot.  Muscle strength was noted to be 5/5 and range of motion was within normal limits.  (Tr. 293.)

Plaintiff returned to Dr. Battula on November 14, 2006, and reported that she was irritable, angry and easily frustrated, but had no problems with sleep.  Plaintiff also reported that she

---

[2]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/ illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) at 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

[3]Adderall is used as part of a treatment program to control symptoms of ADHD. Medline Plus (last revised July 1, 2009) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html>.

had experienced abdominal pain for several months. Plaintiff's mood and affect were noted to be depressed and irritable. Dr. Battula instructed plaintiff to increase her dosage of Adderall, and Cymbalta[4] was prescribed. Plaintiff was diagnosed with ADD and major depressive disorder. OCD was to be ruled out. Dr. Battula also questioned whether plaintiff had irritable bowel syndrome. Plaintiff was assigned a GAF score of 55.[5] Plaintiff was instructed to return in three to four weeks. (Tr. 274.)

On December 6, 2006, plaintiff reported to Dr. Broadhead that she would like to undergo surgery for her foot condition. Plaintiff reported that conservative treatment, including injections, provided minimal or no relief. It was noted that plaintiff's insurance would be checked. Another injection was administered. Darvocet[6] was prescribed for pain. (Tr. 292.)

Plaintiff returned to Dr. Battula on December 29, 2006, and reported that she continued to feel sad. It was noted that Adderall helped with symptoms of ADD but that Cymbalta was not helping. It was noted that there was marital discord at home and

---

[4]Cymbalta is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

[5]A GAF score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).

[6]Darvocet is used to relieve mild to moderate pain. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

that plaintiff and her husband were not getting along. Plaintiff's mood and affect were noted to be depressed and anxious. Plaintiff was diagnosed with ADD, anxiety disorder and depressive disorder. OCD was to be ruled out. Plaintiff was instructed to continue with Adderall, and Cymbalta was discontinued. Xanax[7] was prescribed. It was noted that plaintiff was not very willing to try an anti-depressant at the present time. A GAF score of 50 was assigned. (Tr. 273.)

On February 14, 2007, plaintiff visited Dr. Battula and reported that Xanax helped her condition but made her sleepy. Plaintiff reported continued medical problems. Dr. Battula continued in his diagnoses and assigned a GAF score of 50. Plaintiff was instructed to continue with Adderall and to discontinue Xanax. Klonopin[8] was prescribed. (Tr. 272.)

Plaintiff returned to Dr. Battula on March 13, 2007, and reported that she was pregnant. Plaintiff reported that her obstetrician indicated that she was "okay" with her medications. Dr. Battula continued in his diagnoses and instructed plaintiff to continue with her medications. Dr. Battula continued to question whether plaintiff had irritable bowel syndrome. Dr. Battula

---

[7]Xanax is used to treat anxiety disorders and panic attacks. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

[8]Klonopin is used to relieve panic attacks. Medline Plus (last revised May 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

assigned a GAF score of 50.  (Tr. 271.)

On April 17, 2007, plaintiff reported to Dr. Battula that her stepfather died the previous week and that the event did not cause her to be sad.  Plaintiff reported having back pain and headaches and that she had been hospitalized.  Dr. Battula noted plaintiff to be tearful when talking about her history with her stepfather.  Dr. Battula continued in his previous diagnoses and added that plaintiff suffered from PTSD.  A GAF score of 50 continued to be assigned. Plaintiff was instructed to continue on her medications and to return in six weeks.  (Tr. 270.)

Plaintiff visited Dr. Battula on May 29, 2007, who diagnosed plaintiff with ADD, anxiety disorder and PTSD.  Dr. Battula assigned a GAF score of 55 and instructed plaintiff to continue with her medications.  (Tr. 269.)

Plaintiff returned to Dr. Battula on July 3, 2007, and reported that she was close to delivery with her child. Plaintiff's mood was noted to be good.  A GAF score of 55 was assigned.  Dr. Battula continued in his diagnoses and instructed plaintiff to continue on her medications.  (Tr. 268.)

Plaintiff returned to Dr. Broadhead on August 29, 2007, and reported increased pain in her foot.  Physical examination showed pain with palpation and positive crepitus with range of motion and attempted palpation.  Localized erythema was also noted. The surgical process was discussed.  (Tr. 291-92.)

Plaintiff reported to Dr. Battula on September 10, 2007, that she was stressed out and suffered from "post-partum blues." Plaintiff had depressed mood and affect. Dr. Battula assigned a GAF score of 50. Plaintiff was instructed to increase her dosage of Adderall and Klonopin. Plaintiff indicated that she was not interested in anti-depressants at that time. Plaintiff was instructed to return in six weeks. (Tr. 267.)

On October 1, 2007, plaintiff underwent a bunionectomy and arthroplasty on the right foot. Plaintiff tolerated the procedure well. Plaintiff was prescribed Keflex (an antibiotic) and Percocet[9] for pain. (Tr. 294-95.)

On October 15, 2007, plaintiff continued to complain to Dr. Battula of marital discord and of being stressed. Plaintiff was noted to be depressed and anxious in her mood and affect. Dr. Battula continued in his diagnoses of ADD, PTSD and anxiety disorder, and continued to assign a GAF score of 50. Plaintiff was instructed to continue with her medications and to return in two months. (Tr. 266.)

Plaintiff failed to keep all of her follow up appointments with Dr. Broadhead subsequent to foot surgery. Plaintiff intermittently reported to Dr. Broadhead that she experienced pain and swelling. Cortisone injections were

---

[9]Percocet is used to relieve moderate to severe pain. <u>Medline Plus</u> (last reviewed Feb. 1, 2009)<<u>http://www.nlm.nih.gov/</u> medlineplus/druginfo/meds/a682132.html>.

administered and plaintiff was instructed to keep the affected area splinted. (Tr. 289-91.)

On January 4, 2008, plaintiff visited Dr. Gregory Sayuk regarding recent weight loss. Plaintiff reported having lost approximately forty to fifty pounds within the previous four months. Plaintiff also reported intermittent diarrhea, lower abdominal cramping, dry and cracking skin, and hair loss. Plaintiff reported some weakness, fatigue and lack of energy, as well as numbness and tingling in her hands and fingers. (Tr. 201.) Plaintiff's past medical history was noted to include cyst removal, appendectomy, and anxiety. Plaintiff was noted to be currently taking Klonopin. Physical examination was unremarkable. Given plaintiff's significant weight loss, Dr. Sayuk questioned the presence of an underlying inflammatory bowel disease or other malabsorptive conditions such as celiac sprue or Sheehan's syndrome. Various tests were ordered. Plaintiff was instructed to contact Dr. Sayuk if there were any significant changes in her condition. (Tr. 201-02.)

Plaintiff returned to Dr. Battula on January 7, 2008, and reported hair loss and rapid weight loss. It was noted that plaintiff was not working. Dr. Battula diagnosed plaintiff with ADD and PTSD and assigned a GAF score of 55. Plaintiff was instructed to continue with her medications. (Tr. 265.) On January 29, 2008, Dr. Battula noted plaintiff to be experiencing

increased stress due, in part, to her physical condition. Dr. Battula continued in his diagnoses and GAF score of 55. Plaintiff was instructed to increase her dosage of Adderall and to continue with Klonopin as prescribed. Remeron[10] was added to plaintiff's medication regimen. (Tr. 264.)

The results of an upper GI endoscopy performed on January 30, 2008, showed possible Barrett's esophagus and duodenitis. (Tr. 196.) The results of a colonoscopy performed that same date were normal. (Tr. 193.) Biopsy of tissue from the esophagus showed GE junction mucosa with acute and chronic inflammation. The remaining biopsies showed no abnormalities. (Tr. 191.)

Plaintiff was admitted to the emergency department at St. Joseph Health Center on February 10, 2008, complaining of chest pain. (Tr. 222.) Plaintiff reported having had such pain for two weeks. Plaintiff's past medical history was noted to include anxiety, ADHD, irritable bowel syndrome, and chronic abdominal pain. (Tr. 224.) Plaintiff's medications were noted to include Klonopin and over the counter Tylenol. (Tr. 226.) A chest x-ray taken that same date showed no active disease. (Tr. 217.) An ECG was normal. (Tr. 218-20.) Plaintiff was given a GI cocktail and Ativan.[11] (Tr. 223.) Plaintiff was discharged that same date in

---

[10]Remeron is used to treat depression. <u>Medline Plus</u> (last reviewed Sept. 1, 2008)<<u>http://www.nlm.nih.gov/medlineplus/</u> druginfo/meds/a697009.html>.

[11]Ativan is used to relieve anxiety. <u>Medline Plus</u> (last reviewed Feb. 1, 2009)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/</u>

improved condition.  (Tr. 227.)

Plaintiff returned to the emergency department at St. Joseph Health Center on February 12, 2008, complaining of chest pain.  (Tr. 230.)  Results of EKG/ECG testing were normal.  (Tr. 232, 240-41.)  A CT scan of the chest yielded negative results. (Tr. 237, 239.)  Plaintiff was given Ativan and Toradol.[12] Plaintiff was discharged home that same date in improved and stable condition.  (Tr. 234.)

On March 3, 2008, Dr. Battula determined for plaintiff to discontinue Remeron and to start taking Lamictal.[13]  Plaintiff was continued on her other medications of Adderall and Klonopin. Plaintiff was diagnosed with ADD and PTSD, and was assigned a GAF score of 50.  (Tr. 263.)

Plaintiff visited Dr. Samantha Sattler on March 7, 2008, and complained of weight loss, numbness, tingling, hair loss, forgetfulness, chest pain, back pain, and dry mouth.  It was noted that plaintiff saw a psychiatrist for ADHD, OCD and anxiety, and that she had been taking Adderall and Klonopin for six months. Physical examination was normal.  Dr. Sattler informed plaintiff

---

meds/a682053.html>.

[12]Toradol is used to relieve moderately severe pain.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a693001.html>.

[13]Lamictal is used to increase the time between episodes of depression, mania and other abnormal moods in patients with bipolar disorder.  Medline Plus (last revised Sept. 1, 2009)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

that she needed to see plaintiff's previous medical records before she could proceed with further testing.  Plaintiff was instructed to return in one month.  (Tr. 248-49.)  Plaintiff returned to Dr. Sattler on March 10, 2008, complaining of respiratory symptoms, "spinal pain," "bone pain," and fatigue.  Dr. Sattler noted plaintiff's "multiple other somatic [complaints]," and noted that she was still awaiting plaintiff's past medical records.  (Tr. 247.)

An x-ray taken March 10, 2008, of the lumbar spine showed apparent sclerosis on either side of the sacroiliac joints. Otherwise, no abnormality of the lumbar spine was noted.  Follow up x-rays of the pelvis were recommended.  (Tr. 252.)  An x-ray taken that same date of the chest was normal.  (Tr. 254.)  An x-ray of the thoracic spine showed very mild rightward curvature.  (Tr. 253.)  Follow up x-rays of the sacroiliac joints and pelvis showed benign sclerotic pelvic lesions associated with childbirth.  It was noted that such condition would not be responsible for back pain. (Tr. 250-51.)

On March 21, 2008, plaintiff reported to Dr. Battula that she had been experiencing panic attacks for one to two weeks, including shortness of breath, chest pain and increased heart rate. Dr. Battula noted there to be continued marital discord with possible divorce.  Plaintiff was diagnosed with ADD, PTSD and panic disorder, and was assigned a GAF score of 50.  Plaintiff's dosage

of Lamictal was increased.  Plaintiff was instructed to continue with her other medications.  (Tr. 262.)

Plaintiff returned to Dr. Sattler on March 27, 2008, with a computer printout of symptoms associated with her complaints, including bruising, pain, memory loss, fatigue, bladder/bowel problems, blurred vision, tingling, weakness, feeling off balance, ringing in her ears, headache, shakiness, sweats, swelling, dry mouth, dizziness, and nausea.  Dr. Sattler noted that plaintiff saw Dr. Battula for anxiety, ADHD, OCD, and bipolar disorder.  Physical examination was essentially unremarkable.  Plaintiff had no motor deficits and was able to move all four extremities.  Strength was noted to be 5/5 throughout, and deep tendon reflexes were 2+ and symmetric.  Dr. Sattler diagnosed plaintiff with probable somatoform disorder, dental abscess, back pain, ADHD, and bipolar and anxiety disorders.  Dr. Sattler prescribed Darvocet for pain. (Tr. 246.)

On April 7, 2008, plaintiff failed to appear for a scheduled appointment with Dr. Sattler.  (Tr. 247.)

On April 8, 2008, Dr. Broadhead determined to defer further treatment of plaintiff's foot condition on account of plaintiff's treatment for possible leukemia.  On April 22, 2008, Dr. Broadhead noted that plaintiff failed to appear for a scheduled appointment, noting specifically that plaintiff had recently been diagnosed with leukemia.  (Tr. 289.)

On April 14, 2008, plaintiff reported to Dr. Battula that she had a low white blood cell count and that she was undergoing further testing for leukemia. Dr. Battula continued in his diagnoses and GAF score of 50, and instructed plaintiff to continue with her medications. (Tr. 261.)

Plaintiff visited Dr. Matthew Meier on April 7 and 18, 2008, regarding her complaints of weight loss, loss of appetite, body aches, bleeding gums, hair loss, chest pain, weakness, and forgetfulness. Dr. Meier suspected that plaintiff suffered from depression and opined that the condition would be fully treatable and that plaintiff would be fully functional if she took her medications as prescribed. (Tr. 280-83.)

Plaintiff visited Dr. Dalius Kedainis on May 12, 2008, and complained of persistent tiredness and fatigue, weight loss, hair loss, and poor healing of wounds. Plaintiff also reported diarrhea. Dr. Kedainis noted diagnostic tests to have yielded negative results and that there was no evidence of Crohn's disease. Physical examination showed lower abdominal pain. No paraspinal tenderness was noted. No edema was noted. Motor, sensory and reflex examinations were intact. Plaintiff's strength was noted to be 5/5. Upon conclusion of the examination, Dr. Kedainis diagnosed plaintiff with unintentional weight loss, abdominal pain, fibromyalgia, anemia, and recent jaundice. Diagnostic tests were

ordered and plaintiff was prescribed Ultram[14] for pain. (Tr. 333-34.)

Chest x-rays taken May 20, 2008, were normal. (Tr. 349.) Pelvic x-rays taken that same date showed small ovarian cysts with a small amount of free pelvic fluid. (Tr. 348.)

Plaintiff returned to Dr. Kedainis on May 30, 2008, and continued to complain of lower abdominal pain, chronic diarrhea, acute dysphagia, and muscle weakness. Tenderness was noted about the lower abdomen. Dr. Kedainis diagnosed plaintiff with abdominal pain, fibromyalgia, chronic diarrhea, and inguinal lymphadenopathy. Additional diagnostic tests were ordered, and plaintiff was instructed to start Neurontin.[15] (Tr. 335.)

On June 17, 2008, Aine Kresheck, a medical consultant with disability determinations, completed a Psychiatric Review Technique Form in which s/he opined that plaintiff suffered from anxiety-related disorders (PTSD and panic disorder), an organic mental disorder (ADHD), and from an affective disorder (major depressive disorder). Consultant Kresheck opined that such impairments resulted in mild limitations in plaintiff's activities of daily living and in maintaining social functioning; and resulted

---

[14]Ultram is used to relieve moderate to moderately severe pain. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

[15]Neurontin is used to relieve the pain of postherpetic neuralgia. Medline Plus (last revised Sept. 1, 2009) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

in moderate limitations in maintaining concentration, persistence or pace. Consultant Kresheck opined that plaintiff had no extended, repeated episodes of decompensation. (Tr. 299-310.) In a Mental Residual Functional Capacity Assessment completed that same date, Consultant Kresheck opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was otherwise not significantly limited in the domain of Understanding and Memory. It was also opined that plaintiff was moderately limited in her ability to carry out detailed instructions and in her ability to maintain attention and concentration for extended periods, but was otherwise not significantly limited in the domain of Sustained Concentration and Persistence. Consultant Kresheck also opined that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but was otherwise not significantly limited in the domain of Adaptation. Finally, it was opined that plaintiff was not significantly limited in any regard in the domain of Social Interaction. Consultant Kresheck concluded that plaintiff was capable of understanding and completing at least one-to-two-step instructions. (Tr. 311-13.)

On June 18, 2008, Diane L. Wooten, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment in which she opined that plaintiff could occasionally lift and carry twenty pounds, frequently lift

and carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and had unlimited ability to push and/or pull. Consultant Wooten opined that plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes or scaffolds. It was further opined that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 314-19.)

On July 2, 2008, plaintiff visited Dr. Kedainis and continued to complain of abdominal pain. Epigastric tenderness was noted. Dr. Kedainis continued in his diagnoses of plaintiff. Vicodin[16] was prescribed. (Tr. 336.)

In a note dated July 13, 2008, Dr. Kedainis wrote: "Ms. Amis is a patient at my clinic. She is being treated for fibromyalgia." (Tr. 337.)

Plaintiff visited Dr. Kedainis on July 21, 2008, and complained of abdominal discomfort and toe pain in the right foot. Dr. Kedainis noted plaintiff's dysphagia to have resolved. Physical examination showed tenderness about the area of the right great toe. Otherwise, the examination was unremarkable. Dr. Kedainis diagnosed plaintiff with fibromyalgia, abdominal pain and status post-operative right toe pain. Diagnostic tests were

---

[16]Vicodin is used to relieve moderate to severe pain. <u>Medline Plus</u> (last revised Oct. 1, 2008)<<u>http://www.nlm.nih.gov/</u>medlineplus/druginfo/meds/a601006.html>.

ordered.  (Tr. 338.)

An x-ray taken of plaintiff's right foot on July 21, 2008, in response to plaintiff's complaints of pain showed post-operative changes.  There was no evidence of recent fracture or dislocation.  (Tr. 350.)

Plaintiff visited Dr. Kedainis on September 17, 2008, and complained of intermittent abdominal pain and cramping.  It was noted that plaintiff's diffuse abdominal and body aches had resolved, and that plaintiff was gaining weight.  Physical examination showed tenderness about the lower abdomen.  Tenderness was also noted about the first toe of the right foot.  Plaintiff was diagnosed with abdominal pain, fibromyalgia, irritable bowel syndrome, allergic rhinitis, and post-operative foot pain and tenderness.  Plaintiff was referred to Dr. Broadhead for evaluation of her foot.  Vicodin was prescribed for plaintiff's fibromyalgia.  Various tests were ordered to address plaintiff's abdominal complaints.  (Tr. 339.)

On September 22, 2008, plaintiff underwent an ultrasound of the abdomen in response to her complaints of abdominal pain and weight loss.  The results of the ultrasound were normal.  (Tr. 351.)  On September 25, 2008, plaintiff underwent a CT scan of the abdomen and pelvis.  A small, non-obstructive kidney stone was observed.  Otherwise, the results of the CT scan were unremarkable.  (Tr. 352.)

On September 26, 2008, Dr. Battula completed a Mental Residual Functional Capacity Questionnaire in which he noted plaintiff's diagnoses to include ADD, PTSD and panic disorder. Dr. Battula indicated plaintiff's current GAF score to be 50, and noted that her highest GAF score within the past year was 55. Dr. Battula noted plaintiff to have a moderate response to treatment and counseling. Dr. Battula reported that plaintiff's medications were Klonopin, Lamictal and Adderall, and reported further that plaintiff experienced grogginess with Klonopin. Dr. Battula described plaintiff as distractable, depressed and anhedonic, with severe anxiety. Dr. Battula noted plaintiff's prognosis to be guarded. Dr. Battula indicated the signs and symptoms exhibited by plaintiff to be:

*   Anhedonia or pervasive loss of interest in almost all activities;

*   Appetite disturbance with weight change;

*   Decreased energy;

*   Feelings of guilt or worthlessness;

*   Generalized persistent anxiety;

*   Mood disturbance;

*   Difficulty thinking or concentrating;

*   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

*   Persistent disturbances of mood or affect;

* Apprehensive expectation;

* Intense and unstable interpersonal relationships and impulsive and damaging behavior;

* Easy distractability;

* Sleep disturbance; and

* Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week.

When analyzing plaintiff's mental abilities and aptitudes needed to perform unskilled work, Dr. Battula opined that plaintiff was either unable to meet competitive standards or had no useful ability to function. When analyzing plaintiff's mental abilities and aptitudes to perform semiskilled and skilled work, Dr. Battula opined that plaintiff was either unable to meet competitive standards or had no useful ability to function. When analyzing plaintiff's mental abilities and aptitudes needed to perform particular jobs, Dr. Battula opined that plaintiff was seriously limited but not precluded in interacting appropriately with the general public, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness. Dr. Battula opined that plaintiff was unable to meet competitive standards in her ability to travel in unfamiliar places and to use public transportation. Although prompted by question, Dr. Battula did not explain plaintiff's limitations nor provide the medical/clinical findings to support his assessment. Dr. Battula indicated

that plaintiff's psychiatric condition exacerbated her experience of pain and/or other physical symptoms. Although prompted to do so, Dr. Battula did not explain this finding. Dr. Battula further opined that plaintiff's impairment would cause her to be absent from work on more than four days each month. Finally, Dr. Battula stated that plaintiff had experienced the described limitations since October 2006. (Tr. 326-30.)

Plaintiff visited Dr. Kedainis on October 16, 2008, and complained of abdominal pain in the left lower quadrant. Upon physical examination, plaintiff was diagnosed with irritable bowel syndrome and fibromyalgia. Plaintiff was instructed to continue with Vicodin and to undergo testing for celiac sprue. (Tr. 340.)

Plaintiff returned to Dr. Kedainis on November 13, 2008, and complained of continued abdominal cramps, diarrhea, and recent flank pain. Dr. Kedainis diagnosed plaintiff with irritable bowel syndrome, fibromyalgia, allergic rhinitis, and anxiety. Plaintiff was instructed to continue with Vicodin and to increase her hydration and fiber intake. (Tr. 342.)

### IV. The ALJ's Decision

The ALJ found plaintiff to have met the insured status requirements of the Social Security Act through December 31, 2007. The ALJ further found that plaintiff had not engaged in substantial gainful activity since September 2, 2006, the alleged onset date of her disability. The ALJ found plaintiff's severe impairments to

include "purported fibromyalgia," PTSD, panic disorder, ADD, and history of hammertoe with status-post surgical repair, but determined that plaintiff did not have an impairment or combination of impairments which met or medically equaled an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff to have the residual functional capacity (RFC) to perform a wide range of sedentary work, but that she was limited to performing only simple tasks which required no more than occasional contact with the general public and co-workers. The ALJ found that plaintiff should never climb ropes, ladders and scaffolds; should only occasionally climb stairs and ramps; and could occasionally balance, stoop, crawl, kneel, and crouch. The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age, education, work experience, and functional limitations, the ALJ determined plaintiff able to perform other work that exists in significant numbers in the national economy, as opined by the vocational expert. The ALJ thus found plaintiff not to be under a disability. (Tr. 10-20.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The

Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart

P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

        2.   The plaintiff's vocational factors.

        3.   The medical evidence from treating and
             consulting physicians.

        4.   The plaintiff's subjective complaints
             relating to exertional and non-exertional
             activities and impairments.

        5.   Any corroboration by third parties of the
             plaintiff's impairments.

        6.   The testimony of vocational experts when
             required which is based upon a proper
             hypothetical question which sets forth
             the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86
(8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85
(8th Cir. 1989)).


The Court must also consider any evidence which fairly detracts

from the Commissioner's decision.  Coleman, 498 F.3d at 770;

Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However,

even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by

substantial evidence on the record as a whole.  Pearsall, 274 F.3d

at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.

2000)).  "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the

record could also have supported an opposite decision." Weikert v.

Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation

marks and citation omitted); see also Jones ex rel. Morris v.

Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ's findings regarding her RFC are not supported by substantial evidence in that the ALJ erred in discounting the opinion of Dr. Battula and, further, because no medical evidence supports the ALJ's assessment. Plaintiff also argues that the ALJ erred in finding plaintiff's impairments of fibromyalgia and irritable bowel syndrome not to be severe. Plaintiff also contends that the ALJ erred in finding plaintiff's subjective complaints not to be credible. Finally, plaintiff contends that the ALJ erred in his reliance on vocational expert testimony to find plaintiff not to be disabled inasmuch as the hypothetical posed to the expert failed to capture the concrete consequences of plaintiff's impairments.

A.  Severe Impairments

At Step 2 of the sequential evaluation, the ALJ decides whether a claimant has a severe impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.[17] If the claimant's impairment(s) is not

_____

[17]The ability to do most work activities encompasses "the abilities and aptitudes necessary to do most jobs." Williams v. Sullivan, 960 F.2d 86, 88 (8th Cir. 1992). Examples include physical functions such as walking, sitting, standing, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations;

severe, then she is not disabled.

In this cause, the ALJ determined plaintiff's fibromyalgia, PTSD, panic disorder, ADD, and history of hammertoe with status-post surgical repair to constitute severe impairments. The ALJ specifically found plaintiff's mild scoliosis, gastro-esophageal reflux disease, irritable bowel syndrome, alleged hip impairment, and alleged leukemia not to be severe. (Tr. 12-13.) To the extent plaintiff argues that the ALJ erred in failing to find plaintiff's fibromyalgia not to be severe, the claim is without merit inasmuch as the ALJ did indeed so find. To the extent plaintiff challenges the ALJ's finding regarding irritable bowel syndrome, for the reasons set out below, any error was harmless.

Assuming *arguendo* that plaintiff's diagnosed condition of irritable bowel syndrome constituted a severe impairment, the ALJ's failure to so find arises to nothing more than harmless error. The ALJ here found plaintiff to suffer other severe impairments. As such, he was required to consider any non-severe impairments when determining plaintiff's RFC. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). A review of the ALJ's decision *in toto* shows him to have considered plaintiff's complaints and symptoms related to irritable bowel syndrome in his analysis subsequent to Step 2.

_____

and dealing with changes in a routine work situation. <u>Id.</u> at 88-89.

(Tr. 11, 14-18.)  Given the ALJ's inclusion of this impairment in his subsequent analysis, the determination at Step 2 that the condition was not severe was harmless. See Maziarz v. Secretary of Health & Human Servs., 837 F.3d 240, 244 (6th Cir. 1987); Lorence v. Astrue, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010); see also Chavez v. Astrue, ___ F. Supp. 2d ___, No. EDCV 08-1431-RC, 2009 WL 5172857, at *5 (C.D. Cal. Dec. 21, 2009).

Accordingly, plaintiff's claim that the Commissioner's decision should be reversed on account of the ALJ's failure to find that plaintiff's fibromyalgia and irritable bowel syndrome constituted severe impairments should be denied.

B.    Credibility Determination

Plaintiff claims that the ALJ erred in determining her subjective complaints not to be credible.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  While an ALJ need not explicitly discuss each Polaski

factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. <u>Wildman v. Astrue</u>, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. <u>Id.</u> at 738; <u>see also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005); <u>Pearsall</u>, 274 F.3d at 1218.

In making his credibility determination here, the ALJ set out details of plaintiff's hearing testimony, plaintiff's statements made in her Function Report, statements made by plaintiff's mother in a Third Party Function Report, and the

medical evidence. The ALJ then determined plaintiff's subjective complaints not to be credible, specifically finding the medical evidence not to support her complaints and by finding plaintiff to have inconsistently sought treatment and to be financially motivated in seeking benefits. Plaintiff complains that the ALJ erred in his determination that plaintiff's daily activities and inconsistent treatment record detracted from her credibility. Plaintiff also contends that the ALJ wrongfully considered plaintiff's income level and financial motivation in determining her credibility. For the following reasons, plaintiff's contentions are well taken.

As an initial matter, the undersigned notes that the ALJ's credibility determination identifies evidence in the record relating to all of the <u>Polaski</u> factors but lacks any meaningful discussion reasoning why such evidence so contradicts plaintiff's subjective complaints that her testimony could be discounted as not credible. Indeed, the only inconsistencies identified by the ALJ is the purported lack of ongoing treatment for plaintiff's impairments and plaintiff's lack of a strong work record. (Tr. 18.) For the following reasons, the ALJ's determination to discount plaintiff's complaints solely on these perceived inconsistencies is not supported by substantial evidence on the record as a whole and runs afoul of the mandate of <u>Polaski</u> and its progeny.

The ALJ found the record to lack evidence that plaintiff sought or received ongoing treatment for her impairments. To support this finding, the ALJ stated that plaintiff

> did not initiate treatment with Dr. Battula until more than one month after her alleged onset date and she did not initiate treatment with Dr. Broadhead until nearly two months after her alleged onset date. She did not start seeking treatment for any other allegedly disabling impairments until 2008, well over a year beyond her alleged onset date. Further, the most recent treatment records from Dr. Battula are dated in [sic] April 14, 2008, a full seven months before her hearing, yet no updated records have been received from his office.

(Tr. 18.)

The gap between plaintiff's alleged onset of disability in September 2006 and her first receipt of treatment in October 2006 is not so great as to render incredible plaintiff's subjective complaints. <u>Cf.</u> <u>Branson v. Astrue</u>, 678 F. Supp. 2d 947, 959 (E.D. Mo. 2010) (proper for ALJ to consider that claimant failed to seek regular treatment during the two-year period from his alleged onset date); <u>Brown v. Massanari</u>, 21 Fed. Appx. 541, 542 (8th Cir. 2001) (claimant did not seek treatment until one year after alleged onset date). This is especially true in cases involving mental impairments, given the instability of such conditions and their waxing and waning nature after manifestation. <u>See</u> <u>Rowland v. Astrue</u>, 673 F. Supp. 2d 902, 920-21 (D.S.D. 2009) (citing <u>Jones v.</u>

Chater, 65 F.3d 102, 103 (8th Cir. 1995)). Indeed, with regard to establishing the onset date of a disability, the Social Security Administration has advised that an ALJ may "infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working." Social Security Regulation 83-20, 1983 WL 31249, at *3. See also Rowland, 673 F. Supp. 2d at 922 (referring to deterioration of mental faculties before seeking treatment for depression). As such, the plaintiff's failure to obtain treatment until one month after the alleged onset date of disability is an insufficient basis upon which to determine her complaints not to be credible.

In addition, the ALJ's finding that there was "a lack of medical records documenting ongoing treatment" for plaintiff's mental condition (Tr. 18) is not supported by, and indeed is contrary to, substantial evidence on the record as a whole. Although the ALJ emphasizes the one-month gap between the alleged onset date and plaintiff's first documented visit with Dr. Battula, and the seven-month gap between plaintiff's last documented visit with Dr. Battula and the administrative hearing, the ALJ's credibility analysis in this regard fails to identify the fifteen separate occasions on which plaintiff sought and received treatment from Dr. Battula during the eighteen-month period between October 2006 and April 2008. Nor does the ALJ acknowledge that plaintiff's

two admissions to the emergency room for chest pain during this period required treatment with anti-anxiety medication. Seeking and receiving treatment for mental impairments on at least fifteen separate occasions within an eighteen-month period, and within the two-year period prior to the administrative hearing, cannot be considered a failure to seek and/or receive ongoing treatment for such impairments. Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined. Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996).

The ALJ also determined to discredit plaintiff's subjective complaints on the basis of plaintiff's work record, finding specifically that plaintiff may be financially motivated to exaggerate her symptoms in an effort to obtain benefits given that her previous earnings were at a level below minimum wage. "An award of benefits would certainly be competitive with what she earned when she was working, particularly since the benefits would probably be tax free and she would be relieved of the rigors, expenses and aggravations of working, and she would receive medical benefits." (Tr. 18.) As noted by the Eighth Circuit, however, "all disability claimants are financially motivated to some extent." Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir.

2002). As such, financial motivation should not be dispositive in assessing a claimant's credibility. Id. Instead, "a claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." Id. Because the other factor upon which the ALJ relied to cast doubt upon plaintiff's credibility is not supported by the record, plaintiff's possible financial motivation in seeking benefits cannot serve as a basis upon which to discredit her subjective complaints.

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that her testimony could be discounted as not credible. Masterson, 363 F.3d at 738-39. Accordingly, because the ALJ's decision fails to demonstrate that he considered all of the evidence under the standards set out in Polaski, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in Polaski.

C.  RFC Assessment

Where an ALJ errs in his determination to discredit a claimant's subjective complaints, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations. See Holmstrom v. Massanari, 270 F.3d 715,

722 (8th Cir. 2001). Plaintiff also claims that the ALJ's RFC determination here is flawed inasmuch as 1) the ALJ erroneously discounted the opinion of plaintiff's treating psychiatrist, and 2) it was not based upon medical evidence.

Residual functional capacity is the most a claimant can do despite her physical or mental limitations. <u>Masterson</u>, 363 F.3d at 737. The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC "'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities[.]'" <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996)). A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination. <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002); <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer v. Apfel</u>, 245 F.3d 700, 703-04 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the

workplace.  <u>Hutsell</u>, 259 F.3d at 712 (internal quotation marks and
citation omitted).  An ALJ's RFC assessment which is not properly
informed and supported by some medical evidence in the record
cannot stand.  <u>Id.</u>  An RFC checklist completed by a non-treating,
non-examining physician who has merely reviewed reports is not
*medical* evidence as to how the claimant's impairments affect her
current ability to function and thus cannot alone constitute
substantial evidence to support an ALJ's RFC assessment.  <u>See</u>
<u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000); <u>Nunn v.</u>
<u>Heckler</u>, 732 F.2d 645, 649 (8th Cir. 1984).

    1.   *Weight Given to Opinion of Treating Physician*

       The Regulations require the Commissioner to give more
weight to the opinions of treating physicians than other sources.
20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  A treating physician's
assessment of the nature and severity of a claimant's impairments
should be given controlling weight if the opinion is well supported
by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with other substantial evidence
in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); <u>see</u>
<u>also</u> <u>Forehand v. Barnhart</u>, 364 F.3d 984, 986 (8th Cir. 2004).  This
is so because a treating physician has the best opportunity to
observe and evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a

claimant's] medical impairment(s) and may
bring a unique perspective to the medical
evidence that cannot be obtained from the
objective medical findings alone or from
reports of individual examinations, such as
consultative examinations or brief
hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).


Opinions of treating physicians do not automatically control in

determining disability, however, inasmuch as the Commissioner is

required to evaluate the record as a whole. Wagner v. Astrue, 499

F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777,

783 (8th Cir. 2004). The ALJ may discount or disregard such

opinions if other medical assessments are supported by superior

medical evidence, or if the treating physician has offered

inconsistent opinions. Hogan, 239 F.3d at 961.

When a treating physician's opinion is not given

controlling weight, the Commissioner must look to various factors

in determining what weight to accord the opinion, with such factors

including the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment

relationship, whether the treating physician provides support for

his findings, whether other evidence in the record is consistent

with the treating physician's findings, and the treating

physician's area of specialty. 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2). The Regulations further provide that the

Commissioner "will always give good reasons in [the] notice of

determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this cause, the ALJ determined not to accept the opinions set out in Dr. Battula's September 2008 mental RFC assessment in which plaintiff's limitations were rated at levels inconsistent with an ability to work.  In determining not to credit this assessment, it appears, first, that the ALJ considered Dr. Battula's assessment to be inconsistent with his treatment notes, specifically noting that plaintiff's mental status examinations were frequently within normal limits during office visits and that Dr. Battula frequently noted plaintiff's symptoms to be "mild." The ALJ also stated that Dr. Battula indicated in the assessment that plaintiff's current GAF score was 55, which indicates moderate symptoms.  The ALJ further stated that Dr. Battula appeared to rely "quite heavily on the subjective reports of symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what she reported." (Tr. 18.) The ALJ continued,

> Further, the claimant has a relatively long-standing treating relationship with Dr. Battula and the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their

> patients' requests and avoid unnecessary
> doctor/patient tension.

(Tr. 18.)

These reasons provided by the ALJ are not supported by substantial evidence on the record as a whole and do not provide a sufficient basis upon which to discount Dr. Battula's mental RFC assessment.

To the extent the ALJ states that Dr. Battula reports in his treatment notes that plaintiff's symptoms were mild, a review of the treatment notes themselves shows such notations to have been made in relation to Axis IV of the <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM-IV-TR) multiaxial system.[18]  Axis

---

[18]The DSM-IV-TR utilizes a multiaxial system where each of five axes "refers to a different domain of information that may help the clinician plan treatment and predict outcome."  DSM-IV-TR at 27. There are five axes included in the DSM-IV-TR multiaxial classification:

> Axis I Clinical Disorders Other Conditions That May Be a Focus of Clinical Attention,
>
> Axis II Personality Disorders Mental Retardation,
>
> Axis III General Medical Conditions,
>
> Axis IV Psychosocial and Environmental Problems,
>
> Axis V Global Assessment of Functioning.

<u>Id.</u>

The multiaxial system:

> facilitates comprehensive and systematic evaluation with attention to the various mental disorders and general medical conditions, psychosocial and environmental problems, and level of functioning that might be

IV measures the psychosocial and environmental problems experienced by a patient and does not indicate the severity of any symptoms. To interpret Dr. Battula's treatment notes as indicating that plaintiff's symptoms were mild is error.

The ALJ also states that Dr. Battula's September 2008 assessment assigned a current GAF score of 55, which indicates moderate symptoms. A review of the assessment itself, however, shows Dr. Battula to have assigned a current GAF score of 50, indicating serious symptoms or a serious impairment in functioning, such as the inability to keep a job. Although the ALJ states that Dr. Battula's September 2008 assessment denoting serious limitations "departs substantially from the rest of the evidence of record" (Tr. 18), a review of the record as a whole shows the contrary. Indeed, of the fifteen separate office visits with Dr. Battula, plaintiff was assigned a GAF score of 50 on at least ten occasions. As such, the serious limitations imposed by Dr. Battula in the mental RFC assessment are not inconsistent with the numerous and repeated findings made over a two-year period that plaintiff had a GAF score of 50 indicating serious limitations. See Pate-Fires v. Astrue, 564 F.3d 935, 944-45 (8th Cir. 2009).

_____

overlooked if the focus were on assessing a single presenting problem. A multiaxial system provides a convenient format for organizing and communicating clinical information, for capturing the complexity of clinical situations, and for describing the heterogeneity of individuals presenting with the same diagnosis.

Id.

Finally, there is no evidence in the record suggesting that Dr. Battula completed the assessment out of sympathy or in an effort to avoid doctor/patient tension. Nor is there evidence suggesting that plaintiff was insistent in any way in obtaining certain opinions from Dr. Battula. Without any evidence demonstrating that plaintiff or her treating physician engaged in the inappropriate conduct alluded to by the ALJ, it was error for the ALJ to discount the opinion of plaintiff's treating physician on this basis and to construe the length of plaintiff's treatment relationship and the frequency with which she saw her treating physician as a negative factor upon which to discount the physician's opinion.

Accordingly, the ALJ's reasons for discounting Dr. Battula's September 2008 Mental RFC Assessment are not supported by substantial evidence on the record as a whole and do not constitute good reasons for failing to give controlling weight to Dr. Battula's opinions therein.

2. *Medical Evidence of RFC*

The ALJ found plaintiff to have the RFC to perform a wide range of sedentary work, but that she was limited to performing only simple tasks which required no more than occasional contact with the general public and co-workers. The only medical evidence contained within the record that addresses plaintiff's mental ability to function in the workplace is that opinion from Dr.

Battula in which he opines that plaintiff's mental impairments result in limitations precluding her ability to perform work-related functions. The ALJ's determination to discount this opinion left the record devoid of any substantial medical evidence upon which the ALJ could base an RFC finding regarding plaintiff's mental ability to work. The RFC checklist completed by a non-examining consultant does not constitute medical evidence upon which the ALJ could rely, alone, in determining plaintiff to have the mental RFC to work. Because the ALJ's RFC determination with respect to plaintiff's mental ability to perform work-related functions is not supported by some medical evidence in the record, the ALJ's determination is not supported by substantial evidence on the record as a whole and cannot stand.

D.   Vocational Expert Testimony

In determining plaintiff not to be disabled, the ALJ relied on the testimony of the vocational expert in which he opined that plaintiff could perform certain jobs at the sedentary level in the national economy. This opinion was based upon the ALJ's hypothetical in which the vocational expert was asked to assume that plaintiff had the RFC to perform sedentary work but was limited to simple tasks which required no more than occasional contact with the general public and co-workers. As discussed supra at Section V.C, this RFC determination is not supported by substantial evidence on the record as a whole. Because the ALJ's

RFC determination was flawed, his reliance on vocational expert testimony based on this flawed determination was error. A vocational expert's testimony given in response to a hypothetical question based upon a faulty determination of a claimant's RFC cannot constitute sufficient evidence that the claimant is able to engage in substantial gainful employment. <u>Lauer</u>, 245 F.3d at 706.

Therefore, for all of the foregoing reasons, the undersigned finds that the Commissioner's decision is not supported by substantial evidence on the record as a whole and this cause should be remanded for further consideration.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this matter be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **July 28, 2010.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this _14th_ day of July, 2010.

- 47 -